**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MARY COOKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:07CV151 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Mary Cookson for Supplemental Security Income under Title XVI of

the Social Security Act. This case has been assigned to the undersigned United States Magistrate

Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See

28 U.S.C. § 636©). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document

Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 17).

**Procedural History**

On November 14, 2005, plaintiff filed her application for benefits, claiming that she

became unable to work due to her disabling condition on May 14, 2005. (Tr. 49-60). This claim

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated March 11, 2007.[1] (Tr. 20-21, 39-

---

[1]Plaintiff previously filed an application for disability benefits on May 13, 2005. (Tr. 11).
This application was denied initially on February 16, 2006, by an administrative law judge, and by
the Appeals Council. (Id.). Plaintiff did not pursue this claim any further. The ALJ in the current

43, 8-19).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council

of the Social Security Administration (SSA), which was denied on August 31, 2007.  (Tr. 7, 2-5).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§

404.981, 416.1481.

### **Evidence Before the ALJ**

**A.**     **ALJ Hearing**

Plaintiff's administrative hearing was held on December 4, 2006.  (Tr. 147).  Plaintiff was

present and was represented by counsel.  (<u>Id.</u>).  Vocational expert Jeffrey Magrowski was also

present.  (<u>Id.</u>).  The ALJ began the hearing by admitting the exhibits into the record.  (Tr. 148).

The ALJ indicated that he would leave the record open so that plaintiff could submit additional

medical records.  (<u>Id.</u>).

The ALJ then examined plaintiff, who testified that she was 47 years of age.  (Tr. 149).

Plaintiff stated that she left school in the tenth grade and obtained a GED.  (<u>Id.</u>).  Plaintiff testified

that she was five feet, eight inches tall, weighed 150 pounds, and was right-hand dominant.  (<u>Id.</u>).

Plaintiff stated that she was not working at the time of the hearing.  (<u>Id.</u>).  Plaintiff

testified that she last worked eleven to twelve years prior to the hearing.  (<u>Id.</u>).  Plaintiff stated

that at her last position she painted cars.  (<u>Id.</u>).  Plaintiff testified that she painted cars for thirty

years for various automobile shops.  (<u>Id.</u>).  Plaintiff stated that she performed automobile body

work.  (<u>Id.</u>).  Plaintiff testified that she stopped working because business slowed down.  (Tr.

150).  Plaintiff stated that she then began painting furniture.  (<u>Id.</u>).

Plaintiff testified that she stopped working altogether due to her medical problems.  (<u>Id.</u>).

---

action did not reopen the prior determination.  (<u>Id.</u>).

Plaintiff stated that she experiences seizures, high blood pressure, sinus problems, allergies, and back pain. (Id.). Plaintiff testified that she first started experiencing back pain twenty years prior to the hearing. (Id.). Plaintiff stated that she has back pain because her uterus is fused into her back due to scar tissue. (Tr. 151). Plaintiff testified that she has undergone exploratory surgery. (Id.).

Plaintiff stated that she began having seizures when she was sixteen months old. (Id.). Plaintiff testified that she has had seizures her entire life. (Id.). Plaintiff stated that the seizures stopped for about twenty years but started again six to seven years prior to the hearing. (Id.). Plaintiff testified that she went to the emergency room after she experienced a severe seizure during which she fell backwards and cracked her head open. (Tr. 152).

Plaintiff stated that she began seeing Dr. Chris LaGanke in Alabama for treatment of the seizures after she experienced the severe seizure. (Id.). Plaintiff testified that Dr. LaGanke prescribed medication for the seizures. (Id.). Plaintiff stated that Dr. LaGanke is the first doctor to prescribe medication for her seizures since she was a child. (Id.). Plaintiff testified that Dr. LaGanke has changed her medication several times. (Id.).

Plaintiff stated that when she experiences a seizure, she "stares into space" for a while and shakes. (Tr. 154). Plaintiff testified that the seizures last between twenty seconds and ten minutes. (Id.). Plaintiff stated that she is able to hear but is unable to respond when she is experiencing a seizure. (Id.). Plaintiff testified that she does not have grand mal seizures,[2] which involve thrashing on the floor and losing consciousness. (Id.). Plaintiff stated that she only

---

[2]Seizure characterized by the sudden onset of tonic contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to the ground. See Stedman's Medical Dictionary, 1744 (28th Ed. 2006).

passed out during the first severe seizure she experienced. (Id.). Plaintiff testified that there is nothing she knows of that causes the seizures. (Id.).

Plaintiff stated that she experiences seizures daily and she has more than one seizure a day. (Tr. 156). Plaintiff testified that sometimes has seizures in a series and at other times, the seizures occur hours apart from each other. (Id.). Plaintiff stated that the medication has helped the severity of the seizures, although it has not helped reduce the frequency of the seizures. (Id.). Plaintiff testified that she has experienced as many as thirty to forty seizures in one day in the year prior to the hearing. (Id.).

Plaintiff stated that she moved to Missouri from Alabama approximately a year-and-a-half prior to the hearing. (Tr. 157). Plaintiff testified that Dr. Angela Patterson has been treating her since she moved to Missouri. (Id.). Plaintiff stated that Dr. Patterson treats her for her high blood pressure and sinus problems and prescribes medications. (Id.). Plaintiff testified that Dr. Patterson referred her to Dr. Shahid Choudhary for her seizures. (Id.).

Plaintiff stated that Dr. Choudhary ordered an MRI and EEG. (Id.). Plaintiff testified that Dr. Choudhary did not give her the results of the EEG. (Tr. 158). Plaintiff stated that Dr. Choudhary just told her that he would contact her if he needed to change her medication. (Id.). Plaintiff testified that she started seeing Dr. Choudhary because Dr. Carrie Carda told her that she would have to see a neurologist to get her seizures under control before she could address plaintiff's "female problems." (Tr. 159).

Plaintiff stated that she receives Medicaid benefits. (Id.). Plaintiff testified that she started receiving Medicaid benefits a year prior to the hearing. (Id.).

Plaintiff stated that her husband receives disability benefits because he is blind. (Id.).

Plaintiff testified that her children are grown.  (Id.).  Plaintiff stated that she lives with her husband.  (Id.).

Plaintiff testified that her two nieces perform all of plaintiff's household chores.  (Tr. 160).  Plaintiff stated that she is only able to cook meals in the microwave.  (Id.).  Plaintiff testified that her sister and her nieces bring her dinner.  (Id.).  Plaintiff stated that the Nutrition Center brings her lunch during the week.  (Id.).  Plaintiff testified that her sister and her nieces take her shopping for groceries.  (Id.).  Plaintiff stated that her niece occasionally shops for plaintiff.  (Id.).  Plaintiff testified that she receives food stamps in the amount of $50.00 a month.  (Id.).

Plaintiff stated that her mother lives three doors down from plaintiff.  (Tr. 161).  Plaintiff testified that her brother, who live out of town, visit her at her home.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she experiences headaches after having more than one seizure.  (Tr. 162).  Plaintiff stated that she experiences a continuous headache for three days after seizures.  (Id.).

Plaintiff testified that she has poor eyesight.  (Id.).  Plaintiff stated that she is able to read for short periods of time with her glasses.  (Id.).  Plaintiff testified that her vision blurs and she loses her concentration if she tries to read for long periods of time.  (Id.).

Plaintiff stated that she also has problems resulting from arthritis.  (Id.).  Plaintiff testified that she experiences difficulty grasping objects.  (Id.).  Plaintiff stated that she has dropped objects such as coffee cups or soda cans.  (Tr. 163).

Plaintiff testified that she does not walk for exercise.  (Id.).  Plaintiff stated that she occasionally becomes dizzy when walking for long periods.  (Id.).

Plaintiff testified that she also experiences seizures during her sleep.  (Id.).  Plaintiff stated

that she wakes up at night because she experiences seizures.  (Id.).  Plaintiff testified that she

stares at the ceiling and is unable to get out of bed.  (Id.).

Plaintiff stated that she can no longer engage in hobbies, such as embroidery, due to the

seizures.  (Tr. 164).  Plaintiff testified that she is unable to embroider because she lacks the

concentration, has poor vision, and experiences seizures.  (Id.).  Plaintiff stated that she has poked

herself with needles when she experiences a seizure while embroidering.  (Id.).

Plaintiff testified that she also experiences "female problems."  (Id.).  Plaintiff stated that

she experiences long and irregular menstrual cycles.  (Id.).  Plaintiff testified that she also has the

problem with her uterus being fused into her back.  (Id.).  Plaintiff stated that Dr. Carda is treating

her for these female problems.  (Id.).  Plaintiff testified that Dr. Carda advised her to see a

neurologist to get her seizures under control before she would address her female problems.

(Id.).  Plaintiff stated that her seizures are still not under control so Dr. Carda had not taken any

action.  (Tr. 165).

Plaintiff testified that she does not have a social life.  (Id.).  Plaintiff stated that she does

not attend church, go to clubs, or fish.  (Id.).  Plaintiff testified that she has to have someone

accompany her to go shopping because she is unable to look down to see children or to get items

off the bottom shelves.  (Id.).  Plaintiff stated that she stays home the majority of the time.  (Id.).

Plaintiff testified that she spends her days sitting around the house.  (Id.).  Plaintiff stated

that she watches television, talks to her husband, and pets her dog.  (Id.).

The ALJ then questioned plaintiff, who testified that she usually has a headache after

experiencing a seizure.  (Tr. 166).  Plaintiff stated that her headaches last from one to three days.

(Id.).  Plaintiff testified that she occasionally does not have a headache but just feels "fuzzy" after

a seizure. (Id.). Plaintiff stated that she has severe headaches after experiences a cluster of seizures. (Id.).

Plaintiff testified that her doctor has not instructed her to call him when she experiences a seizure. (Tr. 167). Plaintiff stated that she just tells her doctor about the seizures when she sees him. (Id.). Plaintiff testified that she has seen Dr. Choudhary twice. (Id.). Plaintiff stated that she reports the seizures to Dr. Patterson as well, although Dr. Patterson primarily treats her high blood pressure and allergies. (Id.).

Plaintiff testified that she used to drink heavily. (Id.). Plaintiff stated that her doctors in Louisiana advised her to quit drinking to determine if the alcohol affected her seizures. (Tr. 168). Plaintiff testified that she stopped drinking completely for a period of time but it had no effect on the seizures. (Id.). Plaintiff stated that she currently drinks sometimes. (Id.). Plaintiff testified that she drinks a couple of beers occasionally with her husband. (Id.).

The ALJ then examined the vocational expert, Jeffrey Magrowski, Ph.D, who testified that he had experience with people who had seizure problems. (Tr. 169). Dr. Magrowski stated that he has experience with both grand mal seizures, and petit mal,[3] or simpler seizures. (Id.). The ALJ indicated that he wanted Dr. Magrowski to consider petit mal seizures as plaintiff described, where she has absence spells or breaks in focus but does not lose consciousness and is unable to respond for a few minutes to ten minutes. (Id.). The ALJ told Dr. Magrowski to assume that when plaintiff regains the ability to respond, she has minimal residuals. (Tr. 170). The ALJ asked Dr. Magrowski whether seizures of this type would preclude any individual who was capable of

---

[3]Obsolescent term for a cerebral seizure that is not a grand mal seizure; formerly thought to be the clinical manifestation solely of a 3-second spike in wave pattern, as seen on EEG, but now known to be associated with several different EEG patterns. See Stedman's at 1744.

performing light work from functioning. (Id.). Dr. Magrowski testified that it would depend on the frequency of the seizures. (Id.). Dr. Magrowski stated that such an individual would be unable to perform any jobs involving heights or dangerous machinery. (Id.).              Dr. Magrowski testified that the individual could perform work as an office helper, of which over 4,000 jobs exist in the state and 200,000 nationally. (Tr. 171). Dr. Magrowski stated that the individual could perform some light cleaning work, of which 3,000 positions exist in the state and 200,000 nationally. (Id.). He testified that the individual could also perform work as a house sitter, of which 300 exist in the state and 10,000 nationally. (Id.).

Dr. Magrowski stated that the individual could perform the jobs described if the seizures were spaced out and no more than three to four occurred in one day. (Tr. 173). Dr. Magrowski testified that the number of seizures tolerated in a workday would depend upon the level of distraction from the job demands. (Id.). Dr. Magrowski stated that if the individual experienced residuals such as headaches lasting up to an hour after the seizures, this would affect the individual's ability to function at the jobs described. (Tr. 174). Dr. Magrowski testified that, if the ALJ credited plaintiff's testimony, then there would be no jobs that she could perform. (Id.).

Plaintiff's attorney then examined plaintiff's sister, Lisa Brewer, who testified that she lived three houses from plaintiff. (Id.). Ms. Brewer stated that she visits plaintiff frequently. (Tr. 175). Ms. Brewer testified that she visits plaintiff almost daily. (Id.).

Ms. Brewer stated that she observes plaintiff having a seizure every days she visits with her. (Id.). Ms. Brewer testified that her visits with plaintiff last anywhere from fifteen minutes to six hours or more. (Id.). Ms. Brewer stated that plaintiff's seizures last between two and fifteen minutes. (Tr. 176). Ms. Brewer testified that when plaintiff has a seizure, she suddenly stops

talking, stares, and shakes.  (Id.).  Ms. Brewer stated that in a four-hour period, plaintiff has

between two and twenty seizures.  (Id.).  Ms. Brewer testified that she has not detected any type

of pattern that might cause the seizures, such as stress or family tragedy.  (Id.).  Ms. Brewer

stated that plaintiff does not drive because she is unable to drive due to the seizures.  (Tr. 177).

Ms. Brewer testified that she and her daughter are plaintiff's caretakers.  (Id.).  Ms.

Brewer stated that she takes plaintiff to doctor appointments.  (Tr. 178).

Ms. Brewer testified that plaintiff is "cranky" most of the time.  (Tr. 179).

Ms. Brewer stated that she has seen plaintiff fall.  (Id.).  Ms. Brewer testified that she has

also seen plaintiff drop objects she was holding in her hands, such as coffee cups.  (Id.).

The ALJ then examined Ms. Brewer, who testified that plaintiff has reduced the amount of

alcohol she consumes.  (Tr. 180).  Ms. Brewer stated that plaintiff went from drinking a twelve-

pack of beer a day to four a week.  (Id.).

Ms. Brewer testified that she can tell when plaintiff experiences a headache after a seizure.

(Id.).  Ms. Brewer stated that plaintiff squints her eyes and does not want to talk when she has a

headache.  (Id.).  Ms. Brewer testified that plaintiff experiences these headaches quite frequently

but after every seizure.  (Id.).  Ms. Brewer stated that on one occasion, plaintiff had a headache

that lasted several days.  (Id.).  Ms. Brewer testified that the length of plaintiff's headaches varies.

(Tr. 181).

Ms. Brewer stated that plaintiff had difficulty obtaining Medicaid.  (Id.).  Ms. Brewer

testified that once plaintiff finally obtained Medicaid benefits, she had difficulty finding a doctor.

(Id.).

**B.      Relevant Medical Records**

The record reveals that plaintiff presented to Chris LaGanke, M.D., with complaints of seizures that occur nearly daily on July 1, 2004.  (Tr. 111-12).  Dr. LaGanke noted that plaintiff had quit her alcohol intake and continued to experience seizures.  (Tr. 111).  Upon examination, plaintiff was in no apparent distress and her blood pressure was 162/91.  (Id.).  Plaintiff had normal motor strength, reflexes, sensation, gait, and coordination.  (Tr. 112).  Dr. LaGanke's assessment was: complex, partial seizures.[4]  (Id.).  Dr. LaGanke stated that plaintiff's seizures were independent of alcohol intake.  (Id.).  He noted that the absence of abnormality on MRI and EEG does not speak against the fact that plaintiff has seizures.  (Id.).  Dr. LaGanke increased plaintiff's dosage of Depakote.[5]  (Id.).  He indicated that he would consider a 24-hour ambulatory EEG of plaintiff persisted with seizures despite the increase in medication.  (Id.).

Plaintiff presented to Carrie Carda, M.D. on June 22, 2005, with complaints of seizures, high blood pressure, and irregular menses.  (Tr. 126-27).  Plaintiff reported experiencing multiple daily seizures, with as many as 20 to 30 seizures a day.  (Tr. 126).  Plaintiff indicated that she drank alcohol daily.  (Id.).  Dr. Carda's assessment was seizure disorder, abnormal uterine bleeding, and hypertension.[6]  (Tr. 127).  Dr. Carda noted that she would address plaintiff's menstrual complaints after her seizures were under control.  (Id.).  Dr. Carda referred plaintiff to Dr. Choudary.  (Id.).

---

[4]A seizure with impairment of consciousness, occurring in a patient with focal epilepsy. See Stedman's at 1744.

[5]Depakote is indicated for the treatment of epilepsy.  See Physician's Desk Reference (PDR), 437 (59th Ed. 2005).

[6]High blood pressure.  Stedman's at 927.

Plaintiff presented to Dr. Shahid K. Choudhary, M.D. for evaluation of her seizures on June 29, 2005. (Tr. 103-04). Plaintiff reported a history of childhood seizures beginning at the age of fifteen months. (Tr. 103). Plaintiff indicated that she had been doing well until three years prior, at which time she had a seizure where she passed out and hit her head. (Id.). Plaintiff reported that she had been evaluated by a neurologist, who performed tests and told her that there were no abnormalities. (Id.). Plaintiff indicated that she was started on Depakote. (Id.). Plaintiff reported 20 to 30 episodes a day in which she stares into space. (Id.). Plaintiff indicated that she drinks twelve beers a week. (Tr. 104). Upon physical examination, Dr. Choudhary found no focal or neurological deficits. (Id.). Dr. Choudhary's impression was possible seizures. (Id.). Dr. Choudhary stated that plaintiff may possibly have complex partial seizures, although her episodes are "somewhat atypical," and nonepileptic events should be considered. (Id.). He noted that the events could be related to stress or depression. (Id.). Dr. Choudhary recommended that plaintiff undergo an MRI and EEG, and possibly undergo continuous EEG and video monitoring. (Id.). Dr. Choudhary noted that plaintiff indicated that she did not want to undergo testing until she obtained Medicaid benefits. (Id.).

Plaintiff presented to Wendell Elliot, M.D. at the request of the State Family Support Division for evaluation of her eligibility for medical assistance on July 18, 2005. (Tr. 129-40). Plaintiff reported uncontrolled seizures, heavy menses, uncontrolled blood pressure, and a history of alcohol and tobacco abuse. (Tr. 130). Upon examination, plaintiff was found to be unkempt, shaky, and weak. (Tr. 132). Dr. Elliott noted that plaintiff's affect was depressed. (Tr. 135). Dr. Elliott found that plaintiff required further evaluation for her gynecological issues, seizures, blood pressure, alcohol abuse, and depression. (Id.). Dr. Elliott expressed the opinion that

plaintiff was "disabled for DFS purposes for at least 1 year and most likely indefinitely." (Id.).

In January 2006, plaintiff presented to D.K. Varma, M.D. for a physical evaluation at the request of the State Disability Determination Services (DDS). (Tr. 113-20). Plaintiff reported that she worked in an autobody shop for twenty years and quit working several years ago because the shop went out of business. (Tr. 113). Plaintiff indicated that she had about twenty seizures a day. (Id.). Plaintiff also complained of "female problems," back pain following a motor vehicle accident, and a history of hypertension. (Id.). Plaintiff indicated that she smoked one to one and a half packages of cigarettes a day and occasionally drank beer to calm her nerves. (Id.). Plaintiff stated that she was not taking her medication because she could not afford it. (Id.). Upon examination, plaintiff had no motor or sensory deficits. (Id.). Dr. Varma stated that there is no definite clinical evidence of neurological abnormality. (Tr. 115). Dr. Varma's impression was: history of seizure disorder most likely due to anxiety state; hypertension probably essential, untreated; and history of chronic alcoholism. (Tr. 114). Dr. Varma indicated that plaintiff's ability to perform work-related functions could not be evaluated without a proper diagnostic work-up. (Tr. 115).

Plaintiff presented to Angela Patterson, M.D. at the Puxico Clinic on January 23, 2006, for evaluation of her blood pressure. (Tr. 110). Plaintiff reported a history of seizures and noted that her medication had "done a good job." (Id.). Plaintiff indicated that she smoked a package and a half of cigarettes a day and drank alcohol occasionally. (Id.). Upon examination, plaintiff was in no apparent distress. (Id.). Dr. Patterson's impression was hypertension. (Id.). Dr. Patterson prescribed Vasotec[7] and recommended that plaintiff follow-up in two weeks for a more

---

[7]Vasotec is indicated for the treatment of hypertension. See PDR at 2170.

extensive physical and laboratory tests. (Id.).

Plaintiff returned to the Puxico Clinic on March 10, 2006, for a recheck of her blood pressure and for laboratory testing. (Tr. 109). Plaintiff indicated that she smoked one to two packages of cigarettes a day and drank alcohol. (Id.). Sherry Limbaugh, FNP, found that plaintiff was in no apparent distress. (Id.). Plaintiff's blood pressure was 138/90. (Id.). Ms. Limbaugh increased plaintiff's dosage of Vasotec. (Id.). Ms. Limbaugh indicated that plaintiff would be notified of the results of testing performed that day, which included laboratory tests and a chest x-ray. (Id.).

Plaintiff presented to the Puxico Clinic on March 31, 2006, for a follow-up. (Tr. 108). Ms. Limbaugh noted that the chest x-ray was unremarkable, yet a CT scan revealed left lower lobe pneumonia. (Id.). Ms. Limbaugh prescribed medication for the pneumonia. (Id.). She also noted that plaintiff had some arthritis in her right shoulder, for which she advised plaintiff to take an over-the-counter anti-inflammatory. (Id.).

Plaintiff returned to the Puxico Clinic on April 10, 2006, for a follow-up regarding the pneumonia. (Tr. 108). Plaintiff reported some coughing and drainage. (Id.). Upon examination, Ms. Limbaugh found no respiratory distress. (Id.). Ms. Limbaugh noted that plaintiff smelled of alcohol. (Id.). Ms. Limbaugh recommended a follow-up CT scan. (Id.).

Plaintiff presented to the Puxico Clinic on September 13, 2006, to get her blood pressure medication refilled. (Tr. 107). Plaintiff denied any chest pain or shortness of breath. (Id.). Ms. Limbaugh noted that plaintiff appeared about twenty years older than her chronological age, most likely due to alcohol and tobacco dependency. (Id.). Ms. Limbaugh's assessment was hypertension. (Id.). She refilled plaintiff's prescription for Vasotec. (Id.).

Plaintiff presented to Dr. Choudhary on November 14, 2006, for reevaluation of her seizures at the request of Dr. Carda. (Tr. 101). Plaintiff indicated that she has between one and thirty seizures a day. (Id.). Plaintiff stated that she did not return for further work-up as recommended by Dr. Choudhary because she did not have Medicaid. (Id.). Upon examination, plaintiff's motor strength and reflexes were symmetrical. (Id.). Dr. Choudhary stated that plaintiff's episodes were somewhat atypical and that some of plaintiff's episodes were likely nonepileptic events. (Id.). Dr. Choudhary indicated that he would schedule plaintiff for an MRI and EEG. (Id.).

Plaintiff underwent an MRI on November 20, 2006, which was negative. (Tr. 105).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since her alleged onset of disability.

2. The claimant has a combination of a seizure disorder and high blood pressure. This combination of impairments is severe.

3. These medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant's impairments preclude occasional lifting and carrying of more than 20 pounds, frequent lifting of more than 10 pounds, and standing or walking no more than six hours out of an eight-hour workday. Because of her seizure disorder, the claimant is precluded from work involving hazardous machinery or done at unprotected heights, work that involves climbing ropes, or working on scaffolds or ladders.

6. The claimant has past relevant work as an automobile mechanic.

7.      The claimant cannot perform her past relevant work.

8.      The claimant is a "younger" individual.

9.      The claimant has a general education diploma.

10.     The evidence does not document that the claimant has transferable work skills.

11.     Considering the claimant's age, education, work experience, and residual functional capacity for a wide range of light work, Medical-Vocational Rule 202.21 provides a framework for a finding that the claimant is not disabled. There are a significant number of jobs in the state economy that the claimant could perform. Examples of such jobs include office helper, cleaner, and house sitter.

12.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision.

(Tr. 18-19).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on September 19, 2005, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

Because the claimant is not found to be disabled an analysis of whether her intake of alcohol is material is moot.

(Tr. 19).

## Discussion

### A.   Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

Id.

B.     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining the credibility of plaintiff's subjective complaints of pain and limitation.  Plaintiff next contends that the ALJ failed to determine the impact of plaintiff's combination of impairments on plaintiff's ability to engage in substantial gainful activity.  The undersigned will address plaintiff's claims in turn.

**1.      Credibility Analysis**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Specifically, plaintiff contends that the ALJ required plaintiff to provide objective evidence of pain.  Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of

the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 15). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first stated that the medical evidence does not support plaintiff's subjective complaints. (Tr. 16). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ stated that nothing in the medical record indicates that plaintiff's combination of impairments is severe enough to preclude her from performing all work available in the national economy. (Id.). Notably, Dr. Choudhary found no neurological deficits upon examination and an MRI was negative. (Tr. 104, 105). Dr. Choudhary expressed the opinion that plaintiff's seizures

were atypical and possibly related to stress or depression. (Tr. 104). With regard to plaintiff's high blood pressure, the ALJ noted that plaintiff's hypertension has not resulted in dizziness, head pain, fatigue or complications such as ventricular failure, heart disease or renal failure. (Tr. 14). Finally, the ALJ pointed out that no treating physician has ever found or imposed any long-term or significant limitations upon plaintiff's functional capacity due to her impairments. (Id.).

The next noted that plaintiff failed to seek regular treatment for her seizures. (Tr. 13). The medical record reveals significant gaps in treatment sought for seizures. For example, plaintiff did not seek any treatment from July 2004 until she saw Dr. Choudhary in June 2005. Although plaintiff sought treatment at the Puxico Clinic on several occasions in 2006, she did not complain of seizures. Plaintiff did not see Dr. Choudhary again for treatment of her seizures until November 14, 2006. This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ also pointed out that plaintiff did not undergo an EEG or MRI, as recommended by Dr. Choudhary. (Tr. 14, 101). Further, plaintiff told Dr. Varma that she was not taking Depakote that was prescribed for her seizures. (Tr. 14, 113). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003). Although plaintiff claimed that she failed to undergo testing and take prescribed medications due to a lack of finances, there is no indication that plaintiff ever attempted to receive treatment and was refused due to lack of funds. In fact, as the ALJ noted, plaintiff was receiving Medicaid benefits when she reported to Dr. Varma that she lacked the funds to obtain her medication. (Tr. 181).

The ALJ next discussed plaintiff's testimony regarding her seizure disorder. (Tr. 16). The ALJ cited plaintiff's testimony that she has as many as thirty seizures per day. (Id.). The ALJ found that this statement appears to be an exaggeration. (Id.). The ALJ stated that this level of seizure activity would not permit an individual to meet basic living activities, let along work. (Id.). The ALJ noted that, if plaintiff experienced seizures to the degree alleged, she would be closely followed by a neurologist and would be hospitalized frequently. (Tr. 16).

Finally, the ALJ noted that plaintiff stopped working not due to her impairments, but because her employer went out of business. (Tr. 16, 150). The ALJ properly found this fact inconsistent with plaintiff's allegations of disabling impairments.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

## 2. **Assessment of Combination of Impairments**

Plaintiff argues that the ALJ erred by failing to assess plaintiff's impairments in combination and to assess the total impact of these impairments on plaintiff's ability to work. Respondent argues that the ALJ properly accounted for all of plaintiff's impairments in determining their impact on plaintiff's ability to work.

Initially, the undersigned observes that plaintiff indicates no specific deficiency in the

ALJ's opinion, only asserting that the ALJ "failed to assess" the combination of impairments. This argument is controverted clearly by the ALJ's decision. The ALJ explicitly found that plaintiff had a seizure disorder and high blood pressure, but that this "combination of impairments" did not rise to the level of disability. (Tr. 15, 16, 18). The ALJ refers numerous times in his opinion to plaintiff's "impairments" in determining that plaintiff was not disabled. (Tr. 13, 15, 16, 17, 18). In addition to referring to plaintiff's "impairments," the ALJ evaluated each of plaintiff's impairments individually in detail in his decision. Thus, the ALJ properly considered plaintiff's impairments both individually and in combination in reaching his ultimate decision.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this memorandum.

Dated this \_\_\_17th\_\_\_ day of February, 2009.

*Lewis M. Blanton*

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE